## No. 2209.

## Eugene Boren v. The State.

1. THEFT—OWNERSHIP—CHARGE OF THE COURT.—The first count in the indictment alleged the ownership of the stolen property to be unknown, and the second count alleged it to be in one S. The proof sustained the second count. *Held*, that a conviction could be had only under the second count, and therefore the trial court should have confined its charge to that count.

2. SAME—JOINDER OF OFFENSES.—An indictment in several counts is a collection of several bills against the same defendant, for offenses which on their faces appear distinct, under one caption, and found and indorsed collectively as true by the grand jury. The object is to charge the defendant with distinct offenses, under the idea that the court may, as often as it will, allow them to be tried together, thus averting from both parties the burden of two or more trials; or, in another class of cases, to vary what is meant to be one accusation, so as, at the trial, to avoid an acquittal by an unforeseen lack of harmony between allegation and proof, or a legal doubt as to what form of charge the court will approve. The objection urged to the second count in this indictment is that the Eugene Boren therein charged is not alleged, by the descriptive words "the said" or their equivalent, to be the same Eugene Boren charged in the first count; and the same objection is applied to the property. *Held*, that the objection is hypercritical. See the opinion on the question.

3. SAME—REPUGNANCY—VERDICT.—Under the practice of this State a general verdict responds sufficiently to an indictment containing two good counts, and is likewise sufficient under an indictment containing one good and one bad count, inasmuch as it will be assignable to the former. See the opinion *in extenso* on the doctrine of repugnancy.

4. PRACTICE—JURY LAW.—A juror who tried the case qualified himself on his *voir dire* by declaring himself a freeholder in the State. It transpired after the trial that he was neither a freeholder in the State nor a householder in the county. Applying for a new trial, the appellant and his counsel made affidavit that they did not know of the disqualification of the juror until after the return of the verdict. *Held*, that the new trial should have been awarded, notwithstanding appellant and his counsel had intimately known the juror for years.

5. ACCOMPLICE TESTIMONY—CHARGE OF THE COURT.—See the opinion *in extenso* for a state of proof in a theft case under which the trial court

should have given in charge to the jury the law of accomplice testimony.

6. PRACTICE—EVIDENCE.—As tending to prove guilty knowledge on the part of the defendant, the State relied upon the shape and condition of the brand on the alleged stolen animal. It was proved that the brand of the person from whom the defendant claimed to have acquired the animal was a long horizontal " 11," and that the brand on the stolen animal was a short perpendicular 11. The defense offered to prove by stock men that mistakes in the placing of brands were of frequent occurrence. *Held,* that in excluding the evidence the trial court erred.

APPEAL from the District Court of Ellis. Tried below before the Hon. Anson Rainey.

The conviction in this case was had under the second count of an indictment, which count charged the appellant with the theft of a steer, the property of A. Stayton, in Ellis county, Texas, on the seventeenth day of July, 1884. A term of five years in the penitentiary was the penalty assessed.

A. Stayton was the first witness for the State. The substance of his testimony was that he acquired title to the animal described in the indictment in February, 1884. On or about July 19, 1884, he learned that the animal had been taken away, and he went to Ennis to see about it. He found it among a number of cattle on a car about to be shipped. After leaving the car witness saw and passed defendant on the street, but did not speak to him. On the next day he met the defendant in Waxahachie, and had a talk with him about the animal. Defendant said that he got the steer from James Gartin to ship. Witness and defendant went together to the record, but failed to find the mark and brand of the steer on record. They found, however, that it did not correspond with James Gartin's mark and brand. The animal was a brindle steer, branded with a perpendicular 11 on left side.

Doctor J. C. Fears testified, for the State, that he knew the steer in question. It was a brindle steer, branded on the left side with a perpendicular 11, the marks being six or eight inches long. When witness last saw that animal in 1884, it was marked with an underbit in the right ear. Witness last saw that animal on or about July 19, 1884. It, with others, was then being driven by defendant toward Ennis, from the direction of Waxahachie. Witness had always regarded that animal as an estray, but knew that Stayton had posted it.

James Gartin was the next witness for the State. He testi-

fied, in substance, that for several years, and up to the fall of 1883, he owned a small stock of seventy-five or eighty head of cattle, which ranged in the Rankin neighborhood. Witness's brand was a long, horizontal eleven, and was called the "two bars" and the railroad brand. His mark was an underslope in the left and a crop and underslit in the right ear. His branding iron was about twelve inches long, but was generally slipped on his stock, to make the brand longer. Defendant knew the witness's mark and brand well. Witness never gave the defendant permission to ship the steer described in the indictment, or any other animal. Witness was at Charley Sanderson's party on the night of July 4, 1884, and there saw defendant, Tom Hagler, Riley Wheat, Wiley Laton, Clint Sanderson, Alex Rankin, Kirksey Goodwyn and other boys. He did not have a conversation with defendant about a steer on that night. He took two or three drinks with defendant and Clint Sanderson at the barn on that night, but did not drink in front of the house on that night with defendant, Hagler, Laton and Wheat. Witness had previously sold his cattle, and did not own a steer at that time.

Witness was in Ennis on the nineteenth day of July, 1884, and saw defendant and Riley Wheat and others there, but had no conversation with defendant about a steer, either in Bradley's saloon or elsewhere, in which he told defendant that he, witness, had seen the steer in the pen, and that it was all right. Witness stayed in Ennis and attended a dance at the picnic grounds, where he saw the defendant and several others of the boys. He observed the defendant and two of the boys in a close confidential conversation, and, after it was over, he asked the defendant what was the matter. Defendant said that there was some trouble about a steer he had gathered, and that was the first that witness ever heard of this matter. On the following Monday morning defendant and Tarl Tittle came to witness's house and told witness that Stayton was cutting up about a steer, and defendant asked witness to go to Ennis with him and make a bill of sale to Stayton, or an affidavit of some kind. Witness declined, saying he knew nothing about the animal. In order to get rid of defendant and Tittle, witness promised to go to Ennis that night, but had no idea at the time of doing so. About six o'clock on that evening Tittle and Sam Anderson came back and insisted on witness going to Ennis. Witness peremptorily refused, because he knew nothing about the steer.

Bud Williams testified, for the State, that he bought all of James Gartin's stock, except a cow, calf and yearling, in the fall of 1883. He took no bill of sale, he and Gartin being kin folks. He described the brand as a long, horizontal eleven.

J. E. Stout testified, for the State, that he saw the animal in question in the stock pen at Ennis, with a herd of about thirty, on the evening of July 19, 1884. Riley Boren, the father of the defendant, appeared to be in charge of the herd. He had long regarded the animal as an estray, and asked Riley Boren where he got him. Mr. Boren said that he got him up about old man Park's place. It was the recollection of witness that Mr. Boren said he bought the steer from some person, but the name of the person mentioned, as witness recollected it, was not James Gartin. The brand on the steer was a perpendicular 11.

The State closed.

George Wright was the first witness for the defense. He testified that he knew James Gartin's brand to be a horizontal eleven. The branding iron was about ten inches long, but was sometimes "slided" on the animal to make it longer. It may have been put up and down on some few animals, but witness had no recollection of ever seeing any such. The trial court refused to permit this witness, who was a stock man, to answer the question whether or not stock men did not sometimes make mistakes in the manner of applying their branding irons to stock.

E. L. Hagler testified for the defense, that he attended Charley Sanderson's party in July, 1884, and heard a conversation between defendant and James Gartin, in which defendant told Gartin that he knew where one of the "long eleven" steers could be found near old man Boyd's. Gartin proposed to sell the steer to defendant, who declined to buy on the plea that he had no money. Gartin then said: " As you are shipping, take him and ship him and pay me when you get returns, and I will pay you for your trouble." Defendant replied that he would do so if he could get the animal without going to too much trouble. They spoke of the color of the animal as a dark brindle. Wiley Laton, P. Boren, Frank Boren and Riley Wheat were present at this conversation, which occurred on the night of July 4, 1884, in the pasture in front of the house. Wiley Laton, P. Boren and Riley Wheat corroborated the testimony of the witness Hagler. Riley Wheat testified, in addition, that he was in Bradley's saloon, in Ennis, on the evening of July 19, 1884, and

heard defendant say to Gartin: "I have got that 'long eleven' steer of yours." Gartin replied: "That is all right; I have been to the pens and seen him; go ahead." Frank Boren, Tarl Tittle and others were present.

Tarl Tittle, for the defense, corroborated the testimony of Riley Wheat as to what was said by defendant and Gartin at the saloon on the evening of July 19, 1884. In addition he testified that, on the Monday after July 19, defendant got him to go with him in a buggy to Gartin's place, about two miles east of Ennis. They found James Gartin in the field at work. Witness got out of the buggy and sat down on the ground just behind it. James Gartin got into the buggy, and defendant told him that he wanted him to go to Ennis and fix up about that steer. James Gartin replied that his father would not permit him to leave there, but that he would go to Ennis that night and fix it up. Late that evening, the witness and Sam Anderson drove out to Gartin's to ascertain why James Gartin did not come to Ennis according to promise. Witness could not remember what was said by him or Gartin, except that Gartin refused to go to Ennis.

The defense closed.

Alex. Rankin and Kirksey Goodwyn testified, for the State, in rebuttal, that they knew as a fact that the defendant was often on the range of James Gartin's stock, and they thought that he must have been familiar with the said Gartin's brand and stock.

Clint Sanderson testified, for the State, in rebuttal, that he attended Charley Sanderson's party, on the night of July 4, 1884. He went to the barn with defendant and Gartin and others once or twice during the night to take a drink, but heard no conversation between defendant and Gartin about the steer. He did not see Gartin and defendant or other persons go into the pasture in front of the house during that night.

Marquis Davis testified, for the State, in rebuttal, that he was at Charley Sanderson's party on the night of July 4, 1884. He did not see any one go to the pasture in front of the house to take a drink, nor did he hear any conversation between defendant and Gartin about a steer.

The motion for new trial raised the questions discussed in the opinion.

*Kemble & Anderson*, for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge.   This was a conviction for the theft of a steer, under an indictment containing two counts.   The first charges that the animal was an estray and that the owner was unknown; the second, that it was the property of A. Stayton.   The first count is conceded to be good, but it is urged that no conviction can be had upon it for the reason that the proof shows that the name of the owner *was* known to the grand jury, and hence there is a variance between the allegations and the proof under it.   From this well taken position the appellant proceeds to argue that a conviction must be had, if at all, upon the second count alone.   This position, we think, is also correct.   This being so, the trial judge should have confined his charge to the second count, treating the case in his *charge* as though it were the only count in the indictment, (that count alleging the ownership to be in A. Stayton).   (Jorasco v. The State, 6 Texas Ct. App., 238.)

It is further contended that, since no legal conviction can be had under the first count, if the second count is in itself defective the conviction is wrong, because wanting in proper allegations.   This is correct reasoning; and the question for this court to consider is that arising upon the sufficiency of the second count.

One ground of objection is that the Eugene Boren named in the first count is not alleged in the second count to be the identical Eugene Boren named in the first, contending that the descriptive words "the said" should precede the name Eugene Boren in the second count.   The same objection is urged to the description of the steer in the second count.   In short, that it is not made to appear from the allegations in the second count, that the accused and the property alleged to have been stolen in the first count, are identically the same as in the second count.   Eugene Boren is the name of the accused in the first and second counts.   A steer is the property alleged to have been stolen in both counts.   By presumption they are the same; but let us refer to the principles governing counts:

"The word 'count' is used when, in one finding by the grand jury, the essential parts of two or more separate indictments, for causes *apparently* distinct, are combined, the allegations for each being termed a count, and the whole an indictment.   And an indictment in several counts, therefore, is a collection of sep-

arate bills against the same defendant, for offenses which on their faces appear distinct, under one caption, and found and endorsed collectively as true by the grand jury. The object is what it appears to be, namely, in fact to charge the defendant with distinct offenses, under the idea that the court may, as often as it will, allow them to be tried together, thus averting from both parties the burden of two or more trials; or, in another class of cases, to vary what is meant to be the one accusation, so as, at the trial, to avoid an acquittal by any unforeseen lack of harmony between allegation and proofs, or a legal doubt as to what form of charge the court will approve." (1 Bish. Crim. Proc. 421, 422.)

And, "on the face of the indictment, therefore, 'every separate count should charge the defendant as if he had committed a distinct offense, because it is upon the principle of joinder of offenses that the joinder of counts is admitted.'" (Id., 426.)

If, therefore, each count is to be considered as charging a distinct offense, we must look to its allegations to determine its sufficiency, just as though it was the only count in the indictment; and when thus tested and found sufficient we need look no farther. But if not sufficient upon its face, we may then look to the preceding count, or counts, for auxiliary allegations to supply its defects.

It is objected to the second count that it does not, and should have alleged, that "the said Eugene Boren did," etc.; thus showing the accused in both counts to be the same person. This is unnecessary, because, upon its face, the second count is sufficient as regards the accused and also the steer. The illustration given by appellant in his brief is not in point. "The first count charged an assault on Esther Richards, an infant above the age of ten and under the age of twelve years; and the second count charged, in a different form, an attempt to have carnal knowledge of 'the said Esther Richards.' This reference was held not to carry with it the allegation that she was "an infant above the age of ten and under the age of twelve years.'" By reference to the case from which the illustration is drawn, it will be found that it was essential to constitute the offense that the female be alleged and found to be over the age of ten and under the age of twelve years. (State v. Lyon, 17 Wis., 245; Regina v. Martin, 9 C. & P., 225; 38 Eng. C. L., 87; State v. McAllister, 26 Maine, 374.)

In the case under our consideration the age and description

of the accused, as well as the description of the steer, are wholly immaterial.   We have not found, nor do we think a case can be found, in which it is held that it is required that the second count should state, except by using the same name, that the accused in both counts is the same person.   If, however, the description of the person, such as age or condition, is material to the description of the offense, the second count must contain all the elements of the offense, and to repeat the name of the person merely will not be sufficient.

It is further objected to the indictment that "the counts contain repugnant matters, and that, therefore, the verdict of guilty should be taken only on such one or more as are not mutually repugnant."   There being but two counts, if they contain repugnant matters, the verdict of guilty could be referred to neither, because the first is as repugnant to the second as the second to the first, hence the verdict would be found on inconsistent allegations.   "Repugnancy, in general, consists of two inconsistent allegations in one pleading.   And, since both can not be true, and there is no means of ascertaining which is meant, the whole must be as though neither existed, leaving the whole pleading— the indictment, for example—inadequate.   This doctrine applies to *counts only*; that is to say, no *count* should contain repugnant matters, but it does not, in the very nature of things, apply to the repugnancy which of necessity must exist in *different counts*."   (Bish. Crim. Proc., secs. 489, 490, 499.)

We are cited to what Mr. Bishop says in section 492, viz.: "The doctrine of this chapter, as to the indictment, forbids any repugnancy in a count; counts may be joined containing matter repugnant the one to the other.   But even then, if they are for one offense, the verdict of guilty by the jury should be taken only on such one or more as are not mutually repugnant."   In support of the doctrine laid down in this last clause, Mr. Bishop refers to Commonwealth v. Fitchburg Railway Company, 120 Massachusetts, 372.   Consulting this case, it will be found that there were five counts in the indictment, charging the same offense as committed by different means or modes.   The jury returned a verdict of guilty upon three counts.   It was held that, as but one offense was charged, the jury should have been instructed to return a *general* verdict of guilty, or not guilty, upon the whole indictment, as for a single offense ; or to return a verdict of guilty upon the count proved, if either was proved, and not guilty as to all the other counts.   In this

case a general verdict was returned upon the whole indictment, thus filling the measure required in the Massachusetts case.

Now, both counts in this case being good, a general verdict is proper ; and if one be good and the other bad, a general verdict is also proper, and would be assigned to the good count. However, as bearing upon the point in issue, it was not because of the repugnancy in the different counts in the Massachusetts case that the verdict of the jury was held wrong ; but because the defendant was convicted, by the form of the verdict, of three offenses, when he could be legally convicted for but one.

We are of opinion that both counts of the indictment are sufficient, and that the second count is established by proof. Under the rules of law in such cases, the appellant may be convicted under this count, but not the first, for reasons given above, as the record presents the facts to us.

C. H. Hosford, one of the jury trying the case, being examined on his *voir dire* by the court, answered that he was a freeholder in Ellis county, when in fact he was neither a freeholder in the State nor a householder in said county. This was discovered after the trial, and was made a ground for a new trial. We are of opinion that the new trial should have been granted on this ground. Our statute provides that "all male persons, over twenty-one years of age, are competent jurors, unless disqualified under some provision in this chapter." (Code Crim. Proc., art. 650.) The second ground of disqualification is that the juror is not a freeholder in the State or householder in the county.

It appears from the record that the court tested the qualifications of the juror, under the law, and that the juror qualified himself by answering that he was a freeholder. Appellant and his counsel make oath that his disqualification was not known to them until after the trial. There is no evidence that they, or either of them, did, except that which might be supposed to arise from the fact that they had intimately known the juror, Hosford, for years previously. This is not such proof, if it be proof at all, as will prevail over the oaths of appellant and his counsel, that the disqualification was not known to them until after the trial. (Hanks v. The State, 21 Texas, 526 ; 41 Texas, 573; 10 Texas Ct. App., 44.)

When it was called to the attention of the appellant that the steer in question was claimed by Stayton, he stated that he got it from one James Gartin, or that he had taken the animal up

and penned it with others at Ennis, for the purpose of shipping, and that he had taken it believing it to belong to James Gartin. The State proved by Gartin that he had not let Boren have the steer, neither had he authorized him to pen up and ship it. A number of witnesses testified that they heard Gartin give appellant authority to get up and ship the animal; and another witness swore that Gartin, in effect, admitted that he had given such authority.

Now there are two theories presented: First—That appellant did not have authority from Gartin to take the animal. Second —That if Gartin did give the authority, still he, defendant, knew that Gartin did not own the steer, and, therefore, that a taking with this knowledge would be theft. This last hypothesis included the further proposition that Gartin was an accomplice, and hence there was a powerful motive inducing him to deny the giving of the authority. Under this phase of the case thus presented, the court should have given the jury an instruction with regard to accomplice testimony. This omission was calculated to injuriously affect the appellant's rights, all the law demanded by the facts in evidence not being given in charge.

It appears from the record that Gartin's brand was a *long eleven*, placed lengthwise on the animal. The brand on the animal in question was a *perpendicular eleven*, and not so long as the brand used by Gartin. Appellant offered to prove by stockmen that they, by accident, sometimes misplaced their brands on their stock. To this evidence the State objected, and its objection was sustained by the court. We think this was erroneous. The State relied upon the shape and manner in which the brand was placed upon the animal, as strong proof of guilty knowledge. Appellant may have known Gartin's brand, as well as the manner in which it was usually placed on his stock; and, yet, he may have believed that in this particular case the brand was accidentally placed in an unusual manner. We do not discuss the other questions raised, believing that the matters assigned will not arise on another trial.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered February 2, 1887.